UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA M. PASDEN,

             Plaintiff,                     Case No. 2:15-cv-12128
                                        District Judge Robert H. Cleland
v.                                    Magistrate Judge Anthony P. Patti

COMMISSIONER OF SOCIAL
SECURITY,

             Defendant.
_____/

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 19) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 17)

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment, **DENY** Plaintiff's motion for summary judgment, and **AFFIRM** the

Commissioner's decision.

**II.**    **REPORT**

       Plaintiff, Christina M. Pasden, brings this action under 42 U.S.C. §§ 405(g)

and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her application for disability insurance

benefits. This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 17), the

Commissioner's memorandum in opposition and cross motion for summary judgment (DE 19), Plaintiff's reply (DE 20), and the administrative record (DE 11).

### A.     Background

Plaintiff protectively filed her application for benefits on March 19, 2009, alleging that she has been disabled since September 30, 2008.  (R. at 177-183.) Plaintiff's application was denied and she sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ John Dodson held a hearing on May 6, 2011.  (R. at 56-77.)  He subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 82-89.)  On March 4, 2013, however, the Appeals Council remanded the case to the ALJ for rehearing and opinion with instructions to do the following:

1.     Obtain evidence concerning Plaintiff's physical impairments to complete the record in compliance with 20 C.F.R. §404.1512-1513, including, if warranted, a consultative examination and medical source statements about what Plaintiff could still do despite her impairments.

2.     Give further consideration to Plaintiff's maximum Residual Functional Capacity ("RFC")[1] and provide appropriate rational with references in support of the assessed limitations, in compliance with 20 C.F.R. § 404.1545 and S.S.R. 85-16 and 96-8p.

---

[1] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

3.    Obtain evidence from a Vocational Expert ("VE") to clarify the effect of the
      limitations on Plaintiff's occupational base.

(R. at 95.)

Accordingly, ALJ Dodson held a second hearing on July 17, 2013.  (R. at
33-55.)  On August 9, 2013, he issued a second opinion that Plaintiff was not
disabled.  (R. at 20-28.)  On April 18, 2015, the Appeals Council denied Plaintiff's
second request for review.  (R. at 1-4.)  ALJ Dodson's decision became the
Commissioner's final decision.  Plaintiff then timely commenced the instant
action.

### B.    Plaintiff's Medical History

Plaintiff was involved in a motor vehicle crash on September 30, 2008,
resulting in neck stiffness and headaches.  (R. at 273.)  On October 1, 2008, she
saw Dr. Changee Kim and underwent an MRI of the neck, revealing mild
degenerative changes.  (R. at 308.)  She was prescribed physical therapy and
services from a home health care aide.  (R. at 304 and 316.)  Dr. Kim opined in a
physical capacity form that Plaintiff could only walk or stand for one hour and sit
for two hours per day.  (R. at 321.)

Plaintiff also began seeing chiropractor Michael Meeron in October 2008,
complaining of cervical spine pain radiating to her left arm, tingling in her hand,
headaches, and thigh pain.  (R. at 261.)  Dr. Meeron diagnosed her with severe

cervical sprain with myositis and radiculitis, and severe dorsal strain with myositis. (R. at 263.)   An October 24, 2008 cervical spine MRI revealed central disc herniation at C3-C4, broad-based herniation at C5-C6, and left-sided foraminal stenosis.  (R. at 300.)

On November 25, 2008, Plaintiff was seen by neurologist Robert Pierce.  (R. at 273.)  On examination, Plaintiff's neck was supple with a full range of motion, but she had some restriction in side bending bilaterally, most prominently on the left.  (R. at 274.)  Dr. Pierce recommended treatment with Lyrica for her headaches, but did not feel further neurologic intervention was warranted.  (R. at 275.)  At a follow-up examination on December 16, 2008, Plaintiff reported "near resolution of headache symptomology," but did complain about weight gain.  (R. at 270.)  She ultimately discontinued Lyrica because of the weight gain.  (R. at 428.)

Dr. Meeron also referred Plaintiff to an orthopedic spine surgeon, Dr. Martin Kornblum, who saw her on December 9, 2008.  (R. at 337.)  X-rays of the entire spine were unremarkable, though an MRI of her cervical spine showed mild disc displacement of C3-C4 and a 3-4 millimeter herniation at C5-6.  (R. at 338.)  Under Dr. Kornblum's care, Plaintiff underwent cervical facet joint injections in January, February, and March 2009, but reported that the injections provided no relief.  (R. at 281-86, 332.)

4

In April 2009, Plaintiff underwent cervical traction, which ultimately aggravated her pain.  (R. at 425.)  Dr. Kornblum performed a cervical decompression fusion on July 15, 2009.  (R. at 326-27.)  On July 31, 2009, she reported that she was doing well and her sharp pain was gone.  (R. at 325.)

Although Plaintiff's medical record does not otherwise include mental health treatment, she underwent a consultative psychiatric evaluation by psychiatrist Sung Ran Cho, M.D., on August 19, 2009.  (R. at 339-342.)  Dr. Cho assessed a global assessment functioning ("GAF")[2] score of 60 and diagnosed Plaintiff with depressive disorder. (R. at 342.)

Plaintiff continued to experience soreness and stiffness in September and October 2009.  (R. at 396-97, 394-95.)  In February 2010, Dr. Pierce noted that Plaintiff had "significant restricted range of motion with side-bending, rotation, and anterior and posterior flexion of the neck."  (R. at 415.)  He noted, however,

---

[2] The GAF scale was used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians selected a specific GAF score within the ten-point range by evaluating whether the individual was functioning at the higher or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 51-60 was indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV-TR at 34.  However, "the most recent version of the DSM does not include a GAF rating for assessment of mental disorders."  *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL 1328277, at *10 (E.D. Mich. Mar. 28, 2014).

that her upper and lower extremity strength remained 5/5 and found no gait disturbances. (Id.) He recommended that she continue on her current medications and undergo Botox treatments. (Id.)

Aaron Ellenbogen, D.O., M.P.H., saw Plaintiff on March 1, 2010. (R. at 409-411.) Dr. Ellenbogen concluded that Plaintiff had significantly reduced range of motion in her cervical region and trapezius muscles, and echoed Dr. Pierce's diagnosis of post-traumatic dystonia. (R. at 409-410.) Dr. Ellenbogen also recommended Botox injections, but the procedure was rejected by Plaintiff's insurance company. (R. at 406.)

When Plaintiff's pain and numbness continued in 2010, despite an unchanged x-ray of the cervical spine (R. at 375), Plaintiff began seeing Guiseppe Paese, D.O., for pain management. (R. at 369-371.) Dr. Paese concluded that Plaintiff was on a "good medication regimen" and added Norco three times per day. (R. at 370.)

Plaintiff began treatment with Dr. Jason Talbert on June 4, 2012. (R. at 452.) Dr. Talbert diagnosed neck pain and headaches and prescribed Zanalex, Norco, Flexeril, and Topomax. (R. at 452-53.) Plaintiff saw Dr. Talbert twice more: once on December 3, 2012 as part of an urgent care visit, and again on April 10, 2013. (R. at 448-451.)

6

Plaintiff underwent a consultative examination by Habib Gennaoui, M.D., on April 7, 2013. (R. at 436-38.) Dr. Gennoui noted that Plaintiff complained of persistent pain in her neck and constant headaches. (R. at 436.) Dr. Gennaoui concluded that Plaintiff suffered from "remarkable muscle spasm and remarkable decreased range of motion in her neck," as well as decreased hand grip and bilateral shoulder pain, which resulted in difficulty moving her neck. (R. at 437-38.) Dr. Gennaoui also completed a medical source statement, opining that Plaintiff could occasionally lift and carry up to ten pounds, could sit for ten minutes, stand for thirty minutes, and walk for thirty minutes at a time. (R. at 439-440.) In an eight-hour workday, Dr. Gennaoui concluded that Plaintiff could sit less than two hours, stand less than four hours, and walk less than three hours due to her neck pain. (R. at 440.)

## C.    Hearing Testimony[3]

### 1.    Plaintiff's Testimony

At the July 17, 2013 administrative hearing, Plaintiff testified that she had been unable to work since being involved in a motor vehicle crash on October 30, 2008, which caused neck injuries. (R. at 41.) Plaintiff testified that her neck condition was about the same as it was when she testified at the prior hearing. (R. at 36.) She described the neck pain as "sharp," and indicated that it caused her to

_____

[3] I will only address the July 17, 2013 hearing, as it is the one relevant to the instant appeal.

have daily headaches, along with numbness in her hands.  (R. at 37.)  To treat the pain, Plaintiff lies down with a heating pad and takes several medications, including Norco, Zanaflex, nortriptyline, Flexeril, and Enderol.  (Id.)  According to Plaintiff, the medications make her "kind of loopy, dizzy," and Zanaflex puts her to sleep.  (Id.)  Plaintiff testified that she sleeps for 45 minutes to an hour and a half during the day.  (R. at 38.)

Plaintiff lives with her husband and youngest child, who was 19 at the time of the hearing and a student at Michigan State.  (R. at 44.)  She noted that her husband was suffering from cancer.  (Id.)  On a typical day, Plaintiff wakes up at 9:00 a.m. and takes her pain medication.  (R. at 42.)  Then she lies on the couch and watches television until she is ready to take a shower.  (Id.)  She testified that her husband would make her a breakfast of oatmeal because she has difficulty eating without her throat swelling as a result of her neck injury.  (R. at 43.)  After that, Plaintiff continues to lie on the couch, because attempting household chores makes the pain worse.  (Id.)  Plaintiff testified that sometimes her friends come to visit or she visits them to sit and talk.  (R. at 43-44.)  Plaintiff indicated that she drives "[v]ery rarely" and only for short trips because she cannot move her neck and feels it is unsafe.  (R. at 45.)  She stated that she has good days and bad days, but that she is in pain every day.  (R. at 43.)

Plaintiff also discussed the numbness in her hands at length. She explained that the numbness occurs daily and makes it difficult to hold onto things and complete fine motor activities like tying her shoe laces, picking up coins, and using buttons and zippers.  (R. at 38-39.)

Plaintiff testified that she is unable to do a job sitting at a table putting pens together because of the numbness in her hands, as well as the pain in her neck, which makes her unable to look down.  (R. at 39.)  Plaintiff also testified that she would be unable to do a job that involved watching a monitor and using a phone because of the numbness in her hands and headaches.  (R. at 40.)

### 2. Vocational Expert Testimony

Scott Silver testified as the VE at the administrative hearing.  (R. at 45-54.) The VE identified Plaintiff's past relevant work as kindergarten teacher, at the light exertional level with a specific vocational profile ("SVP")[4] of 7, teacher's aide, also at the light level with an SVP of 6, and customer service clerk, at the sedentary level with an SVP of 5.  (R. at 46.)

---

[4] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4P.

The ALJ then presented a hypothetical question to the VE in which he asked if a person of Plaintiff's age, education, and work experience would be capable of performing her past relevant work at the sedentary level if she were limited to "work not involving any kind of fine manipulation" and "work that would not require even occasional rotation of the neck." (R. at 46-47.) He further limited the hypothetical individual to requiring a sit/stand option at will. (R. at 47.) The VE testified that the hypothetical individual would be incapable of performing Plaintiff's past relevant work because of the need for fine manipulation in her previous complaint clerk position, and the other two positions were not at the sedentary exertional level. (R. at 47.) He testified, however, that there were jobs in the national economy that the hypothetical individual could perform. Specifically, he noted that the individual could perform a surveillance monitor position, with 1,000 jobs in the tri-county area, 2,500 jobs in the State of Michigan, and 91,000 jobs in the nation. (R. at 48.) However, the VE explained that this would require the hypothetical individual to make a "self created modification," which would require her to learn to move her eyes rather than her neck when looking at the monitors. (Id. and R. at 53.) The VE noted that an individual who was incapable of dialing a telephone would be precluded from this position. (R. at 49.) Finally, the VE testified that the need to lie down during the day, outside of breaks, would be work preclusive. (R. at 52.)

## D.  THE ADMINISTRATIVE DECISION

On August 9, 2013, the ALJ issued his decision.  (R. at 20-28.)  At Step 1 of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since September 30, 2008.  (R. at 22.)

At Step 2, the ALJ found that Plaintiff had the following severe impairments: disorders of the back with intermittent hand numbness and headaches.  (R. at 22.)

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 22.)

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the  review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Between Steps 3 and 4 of the sequential process, the ALJ evaluated

Plaintiff's RFC and determined that Plaintiff had the capacity to perform sedentary

work "except no fine manipulation; the work must not require even occasional

rotation of the neck; and the work must allow for a sit/stand option at will."  (R. at

23.)

The ALJ determined at Step 4 that Plaintiff was unable to perform her past

relevant work.  (R. at 26.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other

jobs that exist in significant numbers in the national economy.  (R. at 26.)  He

therefore concluded that Plaintiff was not disabled under the Social Security Act.

### E.  STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case

under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal

standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see

also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under

this standard, "substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting

*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.  ANALYSIS

Plaintiff's overarching argument centers around her assertion that the ALJ's

opinion is not sufficiently articulated to permit meaningful review.  Specifically,

she contends that the ALJ failed to consider a significant amount of evidence in the

record, including the treatment notes and opinions of four treating physicians.

Plaintiff also takes issue with the ALJ's treatment of her mental impairments,

noting that the ALJ's opinion does not address her diagnosis of depression. The

Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of

summary judgment because substantial evidence supports the ALJ's conclusions.  I

will address each argument in turn.

### 1.    Treating Physicians

Plaintiff points out that the ALJ fails to mention four of her treating

physicians by name in his opinion: Drs. Kornblum, Pierce, Pease, and Ellenbagen.

Instead, Plaintiff posits, the ALJ relied exclusively on the opinion and treatment

notes of Dr. Talbert, who only saw Plaintiff three times. (R. at 24, 449-453.)[5]

Plaintiff argues that the ALJ's opinion does not make clear what weight was given

to the opinions of the other four treating physicians, and therefore does not allow

---

[5] Notably, the ALJ also does not mention Dr. Talbert by name.

for meaningful review by the Court.  Defendant counters that, although the ALJ did not mention these physicians *by name*, he did acknowledge their *records* by exhibit numbers, which were discussed in the opinion.  Further, Defendant argues that to the extent Plaintiff is making a treating physician rule argument, the treatment notes at issue do not constitute "medical opinions" as defined by 20 C.F.R. § 404.1527(a)(2).

Preliminarily, Plaintiff's argument with respect to this issue is largely undeveloped, as she has failed to inform the Court how the ALJ's express consideration of evidence from the four doctors in question would have changed the ALJ's RFC determination.  *See, e.g., Scott v. Comm'r of Soc. Sec.*, No. 11-11009, 2012 WL 995265, at * 11 (E.D. Mich. Mar. 5, 2012).[6]

Nevertheless, although it would have been clearer if the ALJ had written his opinion using the names of Plaintiff's physicians, Plaintiff's position on this issue is unavailing for several additional reasons.  First, the mere failure to mention a physician by name does not constitute error.  *Monateri v. Comm'r of Soc. Sec.*, 463 F. App'x 434, 2011 WL 3510226, at *10 (6th Cir. 2011) ("Assuming that Dr. Bertschinger was indeed a treating physician, we find that the ALJ's failure to

---

[6] The Sixth Circuit has explained that "[i]t is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."  *McPhereson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *see also United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

specifically mention Dr. Bertschinger by name does not constitute a lack of

substantial evidence."). In fact, case law supports Defendant's contention that

reference to the records will suffice. *Winter v. Comm'r of Soc. Sec.*, No. 12-11962,

2013 WL 4604782, at *2 (E.D. Mich. Aug 29, 2013) (concluding that the ALJ's

failure to mention a physician by name was not an error where he summarized the

physician's treatment records in his opinion.); *Honeycutt-Jeffers v. Astrue*, No. 10-

528, 2012 WL 424986, at * 7 (E.D. Tenn. Jan. 20, 2012) (finding no error where

the ALJ did not identify a treating physician by name, but only by exhibit number).

Here, to be sure, the ALJ considered the treatment records of Dr. Kornblum,

describing the cervical fusion and decompression at CS-6 she underwent on July

15, 2009. (R. at 24, 326-27.) The ALJ correctly notes that Dr. Kornblum

described Plaintiff as doing well and that her sharp pain had been relieved by the

treatment. (R. at 325.) He also summarizes the records September 9, 2010 MRI

performed by Dr. Paese, which revealed less than a two millimeter subgliamentous

herniation at C3-C4, and stable fusion at the C5-C6. (R. at 24, 366.)

Although the ALJ cites to the exhibits containing the treatment notes of Drs.

Pierce and Ellenbogen, he does not specifically describe any of those records in his

opinion. However, the ALJ was not required to discuss every piece of evidence he

received. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir.

2006) (An ALJ need not "articulate his [or her] reasons for crediting or discrediting

each medical opinion," so long as the factual findings demonstrate that he or she considered the opinions). The ALJ's factual findings and RFC assessment in this case demonstrate that he considered those records. Specifically, his limitation to sedentary work without rotation of the neck is consistent with the treatment notes of Dr. Ellenbogen, who described Plaintiff's complaints of pain radiating from her neck, but assessed her muscle strength as full in both the upper and lower extremities. (R. at 409-410.) This is also consistent with Dr. Pierce's note that Plaintiff's upper and lower extremity strength was 5/5, despite a significantly restricted range of motion related to her neck. (R. at 415.) The ALJ therefore did not err by failing to articulate his reasons for crediting or discrediting those records, because his RFC finding is consistent with the treatment notes of the physicians in question. *Arguendo*, even if the failure to specifically reference these records were in error, the omission is harmless.

Finally, the records at issue do not constitute medical opinions such that the ALJ was required to consider them pursuant to the treating physician rule, 20 C.F.R. § 404.1527, which defines "medical opinions" as follows:

> Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions.

17

20 C.F.R. § 404.1527(a)(2). Here, the treatment notes do not opine on what Plaintiff can do despite her symptoms. Nor do they address what restrictions might be due to her alleged symptoms. *See Winter*, 2013 WL 4604782 at *3 (concluding that a physician's treatment notes were not medical opinions within the meaning of 20 C.F.R. § 404.1527(a)(2)). Instead, they are merely office notations addressing Plaintiff's present symptoms at the time of her appointments. Again, although it would have been preferable if the ALJ had explicitly addressed the notes of her treating physicians, it was not a reversible error for him to do so in a cursory manner, as these records are not implicated by the treating physician rule. *See VanSingel v. Comm'r of Soc. Sec.*, 26 F. App'x 488, 489 (6th Cir. 2002) ("If supported by substantial evidence, the Commissioner's decision must be affirmed, even if [the reviewing court] would have arrived at a different result.") (citing *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir.1983)).

### 2.    Plaintiff's Diagnosis of Depression

Plaintiff's second argument—that the ALJ erred by failing to mention the psychiatric consultative examination performed by Dr. Cho—is also unavailing. Again, the ALJ was not required to discuss every piece of evidence in the record. *Kornecky*, 167 F. App'x at 508 ("[A]n ALJ can consider all evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party."). Second, Dr. Cho's diagnosis of depression says nothing

about its severity or potential impact upon Plaintiff's ability to work.  *See Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) (a mere diagnosis of an impairment is not sufficient to meet Plaintiff's burden to show that the impairment is disabling). Plaintiff bears the burden of proving the severity of her impairments at Step 2.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  She has not met that burden here. Although Plaintiff applied for benefits based on her physical limitations and alleged generally that she experiences "depression and frustration" stemming from her physical pain, there is no record that she was ever treated for mental health issues.  (R. at 202; *see also* R. at 84.)  Nor did Plaintiff testify to mental health issues at either of her hearings.  In fact, in Plaintiff's function report, she indicated that her symptoms did not affect her ability to see, to remember, complete tasks, understand, and follow instructions. (R. at 234.)  Finally, Plaintiff has not demonstrated that the ALJ erred by relying on the opinion of the reviewing physician, who opined that Plaintiff's mental impairment was nonsevere.  (R. at 343-353.)  As such, the ALJ did not err in failing to explicitly discuss the one-time examination performed by Dr. Cho.

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for

summary judgment, **GRANT** Defendant's motion for summary judgment, and

**AFFIRM** the Commissioner of Social Security's decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.* If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: June 21, 2016            s/Anthony P. Patti
                                Anthony P. Patti
                                UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record
on June 21, 2016, electronically and/or by U.S. Mail.

                                s/Michael Williams
                                Case Manager for the
                                Honorable Anthony P. Patti